```
        IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


FELISHA WALL,                 )
                              )
          Plaintiff,          )
                              )
     v.                       )
                              )
MARK GULLEDGE, individually and )
in his official capacity; J.R. )
DENNIS SMITH, individually and )     1:22-cv-31
in his official capacity; JAMES )
P. DAVIS, individually and in )
his official capacity; DUSTIN )
CAIN, individually and in his )
official capacity; NORVIN L.  )
FORRESTER, individually;      )
HOLLY SMITH, individually and )
in her official capacity; and )
OHIO CASUALTY INSURANCE COMPANY,)
                              )
          Defendants.         )
```

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is a Motion for Partial Summary Judgment filed by Defendants J.R. Dennis Smith, James Davis, Dustin Cain, and Norvin Forrester, (Doc. 39). For the reasons stated herein, Defendants' motion will be granted in part and denied in part.

## I.  FACTUAL BACKGROUND

This court "view[s] the evidence in the light most favorable to the nonmoving party and refrain[s] from weighing the evidence or making credibility determinations." Sedar v.

_Reston Town Ctr. Prop., LLC_, 988 F.3d 756, 761 (4th Cir. 2021) (citation omitted). "The evidence of the non-movant is . . . believed, and all justifiable inferences are . . . drawn in [her] favor." _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 255 (1986).

Plaintiff's claims for relief against Defendants J.R. Smith, Davis, Cain, and Forrester (collectively the "Deputy Defendants") arise from events that occurred in the Richmond County Magistrate's office, parking lot, and nearby jail on December 2, 2018. (Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶¶ 3–4, 7; Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 29.)[1]

On this date, Plaintiff Felisha Wall and three of her sisters accompanied their father, William Wall, to the magistrate's office for him "to turn himself in" on outstanding charges. (Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 29; Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶ 4.) Believing that "things can be unfair in Richmond County," the sisters "all wanted to kind of take him and be witnesses and make sure anything [sic] happened to him." (Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 29.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed within the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

When they arrived at the magistrate's office, the magistrate — Defendant Holly Smith[2] — was not present, so one of Plaintiff's sisters "called the sheriff to let him know that we were down there." (Id. at 30.) Soon after, Holly Smith and "a bunch of sheriffs" — including Defendants J.R. Smith, Cain, Forrester,[3] and Davis — "pulled up." (Id. at 32; see also Pl.'s Ex. 10, J.R. Smith Dep. (Doc. 43-10) at 25-26.)

Defendant J.R. Smith attests that when Holly Smith arrived, Plaintiff and her sisters began yelling at Holly Smith and calling her "a scared bitch," "intend[ing] to intimidate and belittle [her]." (Defs.' Ex. 1B, J.R. Smith Dep. Excerpts (Doc. 40-4) at 3.) Plaintiff expressly denies that she called Holly Smith names or threatened her at any point and does not recall her sisters doing so either. (See Pl.'s Ex. 4, Felisha Wall Dep.

---

[2] Plaintiff's claims against Defendant Holly Smith are not the subject of this Motion for Partial Summary Judgment. (See generally Doc. 39.)

[3] Plaintiff states in her deposition that Defendant Forrester arrived alongside this initial group of officers. (Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 32.) In his deposition, Defendant J.R. Smith could not recall whether Defendant Forrester was there at that time or showed up later. (Defs.' Ex. 1B, J.R. Smith Dep. Excerpts (Doc. 40-4) at 4.) Defendant Forrester himself attests that he showed up later — around the same time those officers escorted Mr. Wall over to the jail from the magistrate's office. (Pl.'s Ex. 9, Forrester Dep. (Doc. 43-9) at 40.) Regardless, it is undisputed that Defendant Forrester was present on the scene at the times relevant to the claims that have been brought against him.

- 3 -

(Doc. 43-4) at 65–66, 107–110; see also Pl.'s Ex. 1, Shamica
Wall Decl. (Doc. 43-1) ¶¶ 5, 7.)

After Holly Smith and the officers arrived, Plaintiff, her
sisters, and her father, accompanied them into the magistrate
building; Holly Smith entered her office and called Mr. Wall in
to join her, while Plaintiff, her sisters, and the officers
waited outside Holly Smith's office in a common area. (Pl.'s Ex.
4, Felisha Wall Dep. (Doc. 43-4) at 35–37; Defs.' Ex. 1B, J.R.
Smith Dep. Excerpts (Doc. 40-4) at 3.) Defendant J.R. Smith
attests that Plaintiff and her sisters were "cursing and getting
irate" in the waiting room, (Defs.' Ex. 1B, J.R. Smith Dep.
Excerpts (Doc. 40-4 at 3), and "were told numerous times to
lower their voices," (id. at 5). Plaintiff disputes these facts,
contending that for "approximately 15 minutes," while Mr. Wall
was inside the office with Holly Smith, Plaintiff and her
sisters sat in the common area and "engaged in a conversation
with the officers." (Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4)
at 38–39.) Plaintiff avers that the conversations were
"friendly" and just "general talk." (Id. at 39–40.)

After 15 minutes, the officers escorted Mr. Wall out of
Holly Smith's office in handcuffs and walked him "across the
street to the jail." (Id. at 40–41.) Plaintiff and her sisters
followed behind to "get his items, his wallet, his keys, because

- 4 -

he drove his truck up there," (id. at 42), and were permitted to go inside the jail's lobby to retrieve these items, (id. at 43).

While Plaintiff and her sister Shamica entered the lobby of the jail to retrieve Mr. Wall's items, two of Plaintiff's other sisters, Diamond and Shaneequah Wall, remained outside. (Id. at 43.) Plaintiff "heard [Diamond] scream [and] went outside to see what was going on." (Id. at 44.) Diamond told Plaintiff that an officer "just put his hands on me." (Id.) Plaintiff remembers that Diamond "was like, really, really upset." (Id.) At this point, Defendant J.R. Smith "told [the sisters] to leave."

(Id. at 45.)[4] Around this time, Plaintiff also began filming the
events with her phone. (Id. at 46.) The video recording she
produced was offered as an exhibit, (see Pl.'s Ex. 8, Video
(Doc. 43-8)), and manually filed with this court, (see Doc. 42).

---

[4] The parties offer disputed accounts of how many times the
sisters were asked to leave, which officers — if more than one —
made the request, and how expeditiously the sisters complied
with the request(s). For example, Defendant Forrester states
that "[a]ll the deputies that were there asked them to leave on
several occasions." (Defs.' Ex. 1C, Forrester Dep. Excerpts
(Doc. 40-5) at 8.) The officers "wanted them to the leave [the]
magistrate's office and leave the parking lot because they were
yelling and screaming." (Id.) The officers "gave [the sisters]
an opportunity to leave," (Pl.'s Ex. 9, Forrester Dep. (Doc. 43-
9) at 43), and then arrested them as "[t]hey were walking
towards the street," (id. at 97). In accord with Defendant
Forrester's deposition, Defendant J.R. Smith attests that while
Mr. Wall was being "walked across to the jail and processed,"
the "Wall girls stood between the Magistrate's Office and the
jail cursing, hollering, screaming, and was told at that point
multiple times to leave, that their business there was done."
(Defs.' Ex. 1B, J.R. Smith Dep. Excerpts (Doc. 40-4) at 5; see
also id. at 9-10.)

However, Plaintiff's sister, Shamica, states in her
declaration that Deputy Smith was "the only officer to ask us to
leave, and he only asked once." (Pl.'s Ex. 1, Shamica Wall Decl.
(Doc. 43-1) ¶ 9.) She also states that when the sisters were
asked to leave, they "complied and start[ed] walking towards our
cars." (Id. ¶ 10.) Likewise, Plaintiff remembers that only
"Deputy Smith" told the sisters to leave and states that "when
he asked us to leave, we were on the sidewalk . . . [and]
already walking out towards our cars." (Pl.'s Ex. 4, Felisha
Wall Dep. (Doc. 43-4) at 45-46.)

For the purposes of summary judgment, this court credits
the version of events proffered by Plaintiff. See Anderson, 477
U.S. at 255 (1986). These disputes of fact will require
resolution by a jury at trial.

In the light most favorable to Plaintiff, the video recording shows the following:

At the start of the video, Plaintiff and her sisters are standing in a parking lot, (Pl.'s Ex. 8, Video (Doc. 43-8) at 00:00-00:03), and a group of law enforcement officers stand nearby, facing the sisters. (Id. at 00:05-00:06.) Plaintiff can be heard telling her sisters, "Come on, let's go." (Id. at 00:03-00:04.) She also states, apparently directed at the officers, "We going, but we going to bail our daddy out tomorrow." (Id. at 00:05-00:06.)

As the sisters start to walk away from the officers and toward the edge of the parking lot, Plaintiff repeats to her sisters "come on" and "let's go" several times, as well as "don't give them a reason to lock you up." (Id. at 00:06-00:21.) After a few seconds, Shamica stops and tells Plaintiff she needs to go back inside because she still needs to retrieve their father's keys. (Id. at 00:30-00:34.) Shamica then turns around and walks past the officers back into the jail,[5] while Plaintiff and her other two sisters continue to walk away from the

---

[5] Shamica states in her declaration that when she turned around to reenter the jail, the officers gave her permission to reenter. (Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶ 14.) The Deputy Defendants do not appear to dispute that they provided Shamica this permission to reenter.

officers, toward the edge of the parking lot and public street.
(Id.)

Plaintiff and her two sisters walk just beyond the
perimeter of the asphalt-paved parking lot and stand on the
sidewalk and street, respectively, next to several parked cars.
(Id. at 00:35-01:14.) Plaintiff calls out, "Hurry up [Sha]mica,"
while the officers look on. (Id. at 00:43.) Plaintiff and her
two sisters appear to remain standing on the sidewalk and
street, just beyond the paved portion of the parking lot,
through the moment that the officers walk forward and place
Plaintiff and her two sisters under arrest. (Id. at 00:35-
01:14.) As one officer approaches Plaintiff, Plaintiff exclaims,
"Oh listen, I'm just recording. I said I'm just recording." (Id.
at 01:09-01:12.) The officer responds, "Put your hands behind
your back," and repeats that command several times, while
Plaintiff protests, "I have not done anything." (Id. at 01:16-
01:25.) At this point, Plaintiff's phone appears to drop to the
ground and the recording goes dark, (id. at 01:25), although it
continues to capture audio for another thirty seconds. Included
in this audio are voices stating: "You were told to leave," "I
was leaving," "No you were just standing here," "I was just
recording," (id. at 01:27-01:31), and "I was the one that was
trying to keep the peace," (id. at 01:42-01:45).

The parties dispute numerous additional facts about the events that unfolded during and after Plaintiff's arrest. Those facts will require resolution at trial but are not relevant to the motion that is presently before the court.

## II.  **PROCEDURAL HISTORY**

Plaintiff filed her Complaint on December 2, 2021, in Richmond County Superior Court, asserting a total of thirteen claims for relief against a variety of defendants. (See generally Compl. (Doc. 2).) Defendants removed the case to federal court on January 13, 2022. (Doc. 1.)

On January 20, 2022, the Deputy Defendants, Mark Gulledge, and the Ohio Casualty Insurance Company filed a Partial Motion to Dismiss. (Doc. 8.) This court issued a Memorandum Opinion on February 16, 2023, granting in part and denying in part that motion. (See Doc. 24.)

On January 17, 2024, the Deputy Defendants filed a Motion for Partial Summary Judgment, (Doc. 39), asking this court to grant summary judgment on the following claims:

Claim II – First Amendment retaliation brought against Defendant J.R. Smith in his individual capacity pursuant to 42 U.S.C. § 1983.

Claim IV – Fourth Amendment malicious prosecution brought against Defendant J.R. Smith in his individual capacity pursuant to 42 U.S.C. § 1983.

Claim V – Common law malicious prosecution brought against Defendant J.R. Smith in his individual and official capacity.

Claim VI – Common law battery brought against Defendants J.R. Smith, Davis, and Cain in their official capacities.

Claim IX – Intentional infliction of emotional distress brought against Defendant J.R. Smith in his individual and official capacity.[6]

The Deputy Defendants also filed a brief in support of their motion. (Defs.' Br. (Doc. 40).) Plaintiff responded, (Pl.'s Resp. (Doc. 43)), and Defendants replied, (Defs.' Reply (Doc. 44)).

---

[6] Defendants do not include in their motion for partial summary judgment a request that this court rule on Claim I, Fourth Amendment excessive force against all Deputy Defendants pursuant to 42 U.S.C. § 1984, nor Claim VI, common law battery against all Deputy Defendants in their individual capacities. (See Doc. 39 at 1.) These claims will advance to trial. Additionally, Defendants initially asked this court to rule on Claim IX, intentional infliction of emotional distress, as brought against Defendant J.R. Smith in his individual capacity, (see id.), but concede on reply that "summary judgment is not appropriate on this claim," (see Defs.' Reply (Doc. 44) at 11). This claim, too, will advance to trial.

## III. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251-52. The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." <u>McLean v. Patten Cmtys., Inc.</u>, 332 F.3d 714, 718-19 (4th Cir. 2003) (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). "Conclusory or speculative allegations do not suffice" to defeat a motion for summary judgment. <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." <u>McLean</u>, 332 F.3d at 719.

IV.  **ANALYSIS**

Two issues of law and fact underlie the Deputy Defendants'
Motion for Partial Summary Judgement: (1) whether Defendants had
probable cause to arrest Plaintiff; and (2) whether Defendants
are protected by sovereign immunity as to the state law claims
brought against them in their official capacities. (See Defs.'
Br. (Doc. 40) at 3.)

A.  **Disputes of fact exist regarding whether Defendants**
     **had probable cause to arrest Plaintiff.**

"Probable cause is determined by a 'totality-of-the-
circumstances' approach." Hupp v. Cook, 931 F.3d 307, 318 (4th
Cir. 2019) (citation omitted). The Fourth Circuit instructs that

> [t]he inquiry turns on two factors: the suspect's
> conduct as known to the officer, and the contours of the
> offense thought to be committed by that conduct. While
> [a court] look[s] to the information available to the
> officer on the scene at the time, [the court] appl[ies]
> an objective test to determine whether a reasonably
> prudent officer with that information would have thought
> that probable cause existed for the arrest. Evidence
> sufficient to secure a conviction is not required, but
> probable cause exists only if there is sufficient
> evidence on which a reasonable officer at the time could
> have believed that probable cause existed for the
> arrest.

Id. (internal quotation marks and citations omitted).

"An official is not entitled to qualified immunity if he or
she deprived an individual of a constitutional right and that
right was clearly established at the time of the violation." Id.
at 317. Applying the qualified immunity standard to the question

- 12 -

of probable cause, if "a person is arrested when <u>no reasonable</u> <u>officer</u> could believe . . . that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues." <u>Id.</u> at 318 (emphasis added) (citation omitted). But "[t]he question of whether a reasonable officer would have known that the conduct at issue violated that right . . . cannot be decided on summary judgment if disputes of . . . historical facts exist." <u>Id.</u>

On December 2, 2018, the Deputy Defendants arrested Plaintiff and charged her with disorderly conduct in a public building, <u>see</u> N.C. Gen. Stat. § 14-132(a)(1), and resisting a public officer, <u>see</u> N.C. Gen. Stat. § 14-223. (<u>See</u> Pl.'s Dep. Ex. 5, Magistrate's Order (Doc. 43-7) at 1; Pl.'s Ex. 11, Public Records (Doc. 43-11) at 1.)[7] Plaintiff argues that a jury could reasonably conclude that Defendants lacked probable cause at the

---

[7] Plaintiff was also charged with criminal contempt, but it appears this charge was founded upon her alleged behavior <u>after</u> she was arrested for disorderly conduct and resisting arrest and thus is irrelevant to the probable cause inquiry at the time of her arrest. (<u>See</u> Pl.'s Dep. Ex. 5, Magistrate's Order (Doc. 43-7) at 3; Pl.'s Ex. 10, J.R. Smith Dep. (Doc. 43-10) at 33.) To the extent Plaintiff's contempt charge arose from her behavior <u>before</u> her arrest, Plaintiff disputes that she engaged in any type of disruptive behavior that could give rise to a contempt charge. (<u>See</u> Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 107-110; <u>see</u> <u>also</u> Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶¶ 5, 7.)

Case 1:22-cv-00031-WO-JLW   Document 73   Filed 03/31/25   Page 13 of 32

time of her arrest. (Pl.'s Resp. (Doc. 43) at 9.) Defendants concede that genuine disputes of fact about Plaintiff's behavior inside and outside the magistrate's building prevent this court from finding, at this stage of the proceedings, that the officers had probable cause to arrest Plaintiff for a disorderly conduct offense. (See Defs.' Br. (Doc. 40) at 13.) However, Defendants argue that undisputed facts "demonstrate that there was probable cause to arrest Plaintiff on two charges: 1) second degree trespass, N.C.G.S. § 14-159.13; and 2) resisting a public officer, N.C.G.S. § 14-223." (Id.)[8] This court will analyze each argument in turn.

### i. Second-Degree Trespass

A person commits second-degree trespass when the person "remains . . . [o]n premises of another after the person has been notified not to enter or remain there by . . . another authorized person." N.C. Gen. Stat. § 14-159.13(a)(1). "If . . . the premises are open to the public, the occupants of those premises have the implied consent of the owner/lessee/possessor to be on the premises, and that consent can be revoked only upon

---

[8] Although Plaintiff was not actually arrested for second degree trespass, "[b]ecause probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." Dist. of Columbia v. Wesby, 583 U.S. 48, 54 n.2 (2018).

- 14 -

some showing the occupants have committed acts sufficient to render the implied consent void." State v. Marcoplos, 154 N.C. App. 581, 582-83, 572 S.E.2d 820, 821-22 (2002), aff'd, 357 N.C. 245, 580 S.E.2d 691 (2003); see also State v. Nickens, 262 N.C. App. 353, 365-68, 821 S.E.2d 864, 874-76 (2018) (upholding second-degree trespass conviction of a defendant who refused to leave the premises of a DMV after she "raised her voice and began swearing at [a] DMV employee" and was "told . . . to leave"). "It follows that one who remains on privately owned property, without a legitimate purpose, after being asked to leave by someone with authority, may be convicted of second-degree trespass." Marcoplos, 154 N.C. App. at 583, 572 S.E.2d at 822.

Defendants argue that there was probable cause to support a second-degree trespass arrest because Plaintiff "was asked to leave the premises," "did not leave immediately," and "when she was arrested, she had not left the public area." (Defs.' Br. (Doc. 40) at 13-15 (citing Defs.' Ex. 1A, Felisha Wall Dep. Excerpts (Doc. 40-3) at 16-17.) The Deputy Defendants testify that "the Wall girls" stood "in the parking lot between the jail and the Magistrate's office, [and they] continued causing a scene, cursing. They were asked to leave, told that their business there was done. [They] refused to leave, were asked

multiple times to leave." (Defs.' Ex. 1B, J.R. Smith Dep. Excerpts (Doc. 40-4) at 9-10; see also Defs.' Ex. 1C, Forrester Dep. Excerpts (Doc. 40-5) at 8.)

However, Plaintiff has come forward with evidence that disputes several facts material to the second-degree trespass probable cause inquiry. One, Plaintiff offered evidence that only Defendant J.R. Smith asked the sisters to leave, and he only asked once. (Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶ 9; Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 45-47.) Two, Plaintiff offered evidence that when she received Defendant J.R. Smith's order to leave, she and her sisters started to walk, or alternatively, were already walking, away from the officers and toward their vehicles parked on the public street. (See Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶ 10 ("We all complied and start[ed] walking towards our cars."); see Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 45-46 ("[W]hen he asked us to leave, we were walking . . . out towards our cars.").)

The video footage submitted by Plaintiff largely supports this characterization of events. In this court's review of the footage, it can detect no audible request by an officer for the sisters to leave. Thus, it is reasonable to infer that the order for the sisters to leave (all parties agree that at least one order was given) was given sometime before the events depicted

- 16 -

in the video. However, from the record, it is unclear how long
before the video footage that order was given. There is also a
genuine dispute about whether that order was given multiple
times (which would suggest that the sisters did not comply right
away) or only once.

Viewing the evidence in the light most favorable to
Plaintiff, Defendant J.R. Smith ordered the sisters "to leave
the premises" and then the sisters immediately started walking
away, exited the parking lot, and stood on the public sidewalk
and street next to their parked vehicles while they waited for
their sister Shamica (who had been authorized by the officers to
go back inside the jail) to join them. On these facts, "a
reasonably prudent officer" would not have believed that
Plaintiff "remain[ed] . . . [o]n premises of another" after
being notified not to remain there. See N.C. Gen. Stat. § 14-
159.13(a)(1); see also Hupp, 931 F.3d at 318.[9]

_____

[9] In her response brief, Plaintiff also questions whether
the Deputy Defendants had grounds "to revoke the implied consent
[Plaintiff] possessed to remain in [the parking lot]." (Pl.'s
Resp. (Doc. 43) at 10 (citing, inter alia, Marcoplos, 154 N.C.
App. at 582–83, 572 S.E.2d at 821–22)), and whether Defendant
J.R. Smith "'rescinded' his instruction for the sisters to
leave" when he permitted Shamica to re-enter the jail, (id. at
11). Plaintiff argues that there are genuine disputes of fact
relevant to both queries. (Id. at 10–11.) Having decided that
genuine disputes of other material fact prevent a finding as to
probable cause, this court will forgo addressing these arguments
at summary judgment.

- 17 -

Moreover, viewing the evidence in the light most favorable to Plaintiff, <u>no reasonable officer</u> could believe that probable cause for second-degree trespass existed. As a result, the question of qualified immunity is premature at this stage. <u>See Hupp</u>, 931 F.3d at 318 ("Although an actual lack of probable cause is not <u>dispositive</u> for qualified immunity purposes, the boundaries of the statute allegedly violated by the plaintiff are extremely relevant to an assessment of whether an officer's mistake was reasonable." (emphasis in original) (cleaned up)).

## ii. <u>Resisting Arrest</u>

Having found that disputes of fact prevent this court from finding that the officers had probable cause to arrest Plaintiff for a trespass offense, and Defendants having conceded the same for Plaintiff's disorderly conduct offense, the court likewise finds that Plaintiff's resistance to arrest — the conduct that gave rise to her "resisting a public officer" offense — cannot support a finding as to probable cause.

The elements of a "resisting a public officer" offense are:

1) that the victim was a public officer; 2) that the defendant knew or had reasonable grounds to believe that the victim was a public officer; 3) that the victim was discharging or attempting to discharge a duty of his office; 4) that the defendant resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and 5) that the defendant acted willfully and unlawfully, that is intentionally and without justification or excuse.

- 18 -

Nickens, 262 N.C. App. at 364, 821 S.E.2d at 873; see also
N.C. Gen. Stat. § 14-223.

However, in the context of resisting arrest, the law is
well established that "every person has the right to resist
an unlawful arrest," State v. Mobley, 240 N.C. 476, 478, 83
S.E.2d 100, 102 (1954); see also State v. Smith, 225 N.C.
App. 471, 476, 736 S.E.2d 847, 851 (2013) ("The offense of
resisting arrest . . . presupposes a lawful arrest."), and
"may use such force as reasonably appears to be necessary to
prevent the unlawful arrest." State v. Allen, 14 N.C. App.
485, 492, 188 S.E.2d 568, 573 (1972).

Because genuine disputes of material fact prevent a finding
at summary judgment that the Deputy Defendants had probable
cause to arrest Plaintiff for underlying trespass or disorderly
conduct offenses, it is an open question whether her arrest was
"lawful." Depending on how these facts are resolved at trial, it
may well be that Plaintiff acted within her "right to resist an
unlawful arrest," see Mobley, 240 N.C. at 478, 83 S.E.2d at 102,
when she verbally protested arrest, pulled away from the
officer, and refused to put her hand behind her back, (see Pl.'s
Ex. 10, J.R. Smith Dep. (Doc. 43-10) at 42-45; Pls.' Ex. 4,
Felisha Wall Dep. (Doc. 43-4) at 50).

- 19 -

In their briefing to this court, Defendants argue that "a [suspect] need not be under arrest to be guilty of resisting a public officer," (Defs.' Br. (Doc. 40) at 16), and cite several cases to support this proposition. However, each of the cases cited by Defendants involves a suspect who resisted an officer's lawful request or order. See State v. Newman, 186 N.C. App. 382, 388-89, 651 S.E.2d. 584, 588-89 (2007) (officer called in to investigate a "disruptive customer" and the customer "pulled away" from the officer during that investigation); United States v. Ruffin, 814 Fed. App'x 741, 749-50 (4th Cir. 2020) (officer had reasonable suspicion to detain a suspect and that suspect resisted detention, giving rise to probable cause for arrest); State v. Lynch, 94 N.C. App. 330, 332-33, 380 S.E.2d 397, 398-99 (1989) (officer was "attempting to ascertain defendant's identity" but defendant refused to respond and fled).

By contrast, here, considering the facts in the light most favorable to Plaintiff, Defendant J.R. Smith did not have any apparent reason to investigate Plaintiff, did not have constitutional grounds to temporarily detain Plaintiff, and did not need to ascertain Plaintiff's identity. Instead, the video footage shows that Defendant J.R. Smith approached Plaintiff and immediately instructed her to "put [her] hands behind [her] back." (Pl.'s Ex. 8, Video (Doc. 43-8) at 01:16). In other

words, the only order that Plaintiff resisted was the order putting her under arrest, which, at this stage, has not been found to be lawful.

In sum, at summary judgment, disputes of material fact prevent a finding as to probable cause. These issues must be resolved at trial.

**B.** **Defendants are protected by sovereign and/or governmental immunity as to the state law claims brought against them in their official capacities.**

"The doctrine of sovereign immunity bars actions against public officials sued in their official capacities. Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity." Phillips v. Gray, 163 N.C. App. 52, 56–57, 592 S.E.2d 229, 232 (2004) (internal citation omitted); see also Butterfield v. Gray, 279 N.C. App. 549, 554, 866 S.E.2d 296, 301 (2021) ("Sheriffs, sheriff's deputies, and jailers have all been recognized as public officials who may avail themselves of the defense of governmental immunity." (emphasis added)).

- 21 -

Under the doctrine of governmental immunity,[10] a county's public officials sued in their official capacity are immune from suit for intentional torts arising from the exercise of governmental functions, "unless the plaintiff shows that the county or county's public officials waived immunity." See Butterfield, 279 N.C. App. at 554, 866 S.E.2d at 301. A county waives immunity through the "purchase of liability insurance pursuant to N.C. Gen. Stat. § 153A-435," except to the extent "the applicable liability insurance policy excludes a plaintiff's claim from coverage." Id. at 556, at 302.

Here, Defendants have introduced undisputed evidence that Richmond County purchased liability insurance from the North Carolina Association of County Commissioners ("NCACC") during the fiscal years relevant to this suit, (Defs.' Ex. 2, Garner Decl. (Doc. 40-6) at 2), which ordinarily would waive immunity.

_____

[10] In a 2021 opinion, the North Carolina Court of Appeals acknowledged that the court had used the terms "sovereign immunity" and "governmental immunity" interchangeably in its previous decisions and explained that governmental immunity is a subset of a state's sovereign immunity and applies to local governments. See Butterfield, 279 N.C. App. at 553 n.3, 866 S.E.2d at 301 n.3. It further explained that the distinction between the two can be salient because "the more limited" of the two doctrines, governmental immunity, covers only those acts committed pursuant to "governmental functions." Id. However, in the present case, Plaintiff has not challenged that the Deputy Defendants were acting pursuant to "governmental functions" during the events of December 2, 2018, and thus, any distinction is immaterial.

However, the policy purchased by Richmond County expressly excludes "Claims or Suits to which a Covered Person is entitled to sovereign immunity or governmental immunity under North Carolina law." (Defs.' Ex. 2F, 18-19 Public Official Coverage (Doc. 40-13) at 6; see also id. at 4 (explaining contracting parties "inten[tion] for no coverage to exist . . . as to any claim for which the Covered Person is protected by sovereign immunity and/or governmental immunity"); Defs.' Ex. 2G, 18-19 Law Enforcement Coverage (Doc. 40-14) at 4, 6.) Because of this express exclusion, Richmond County's insurance policy does not waive their immunity and Plaintiff's state law tort claims against the law enforcement officers in their official capacities are barred.

For her part, Plaintiff's only argument on this issue is that "the language of the policy does not expressly and unambiguously exclude or limit coverage." (Pl.'s Resp. (Doc. 43) at 21 (emphasis added).) However, Defendants cite multiple opinions where North Carolina courts have found that near identically drafted policies were "unambiguous" and "did not waive governmental immunity." See, e.g., Est. of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 342-43, 694 S.E.2d 405, 409 (2010). Following that precedent,

this court finds that Richmond County's policy is likewise unambiguous.

Accordingly, Claim VI against Defendants J.R. Smith, Davis, and Cain in their <u>official</u> capacities will be dismissed; Claim V against Defendant J.R. Smith in his <u>official</u> capacity will be dismissed; and Claim IX against Defendant J.R. Smith in his <u>official</u> capacity will be dismissed.

## C. **Plaintiff's Remaining Claims**

### i. **Claim II — First Amendment retaliation pursuant to 42 U.S.C. § 1983 (Defendant J.R. Smith in his individual capacity)**

"A plaintiff claiming First Amendment retaliation must demonstrate that: (1) [she] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [her] First Amendment rights, and (3) there was a causal relationship between [her] protected activity and the defendants' conduct." <u>Bhattacharya v. Murray</u>, 93 F.4th 675, 687–88 (4th Cir. 2024) (quotation marks and citation omitted), <u>cert. denied</u>, 145 S. Ct. 443 (2024).

Plaintiff alleges that Defendant J.R. Smith arrested her in retaliation for her exercising her First Amendment right to film the officers. (<u>See</u> Compl. (Doc. 2) ¶¶ 174–87.) Defendants argue that Plaintiff's claim fails as a matter of law because there was probable cause for her arrest, (<u>see</u> Defs.' Br. (Doc. 40) at

- 24 -

11-12 (citing Nieves v. Bartlett, 587 U.S. 391, 408 (2019);
Hulbert v. Pope, 70 F.4th 726, 732 (4th Cir. 2023)), or
alternatively, that the officers are protected by qualified
immunity as to the probable cause determination. (Id. at 19-22.)
This court found that disputes of fact prevent findings as to
probable cause and qualified immunity at summary judgment.

Defendants additionally argue that Plaintiff has not
established a causal relationship between her filming and her
arrest, (Defs.' Br. (Doc. 40) at 17-18), thereby failing to meet
the third element of a First Amendment retaliation claim. See
Bhattacharya, 93 F.4th at 688. For this argument, Defendants
rely on a case where a tenured university professor challenged
his transfer to a new academic department, alleging that he was
retaliated against for "'blowing the whistle' on an improper
business arrangement." See Huang v. Bd. of Governors of Univ. of
N. Carolina, 902 F.2d 1134, 1139-40 (4th Cir. 1990); (see also
Defs.' Br. (Doc. 40) at 17 (citing Huang)). In Huang, nearly six
years passed between when the professor "blew the whistle" and
when he was transferred to a new department. Huang, 902 F.2d at
1140. On those facts, the court found there was "not a scintilla
of evidence that the . . . decision [to transfer] was infected
with a retaliatory motive traceable to the alleged . . .
whistle-blowing incident." Id. at 1141.

- 25 -

By contrast, when First Amendment retaliation claims are based upon an alleged wrongful arrest, there is significant overlap between the probable cause inquiry and the causation element. See Nieves, 587 U.S. at 400-04 ("[B]ecause probable cause speaks to the objective reasonableness of an arrest, its absence will . . . generally provide weighty evidence that the officer's animus caused the arrest.") Here, in the absence of a finding of probable cause, the causal link between Plaintiff's filming and her arrest is strong. Plaintiff was filming the officers at the moment of her arrest and verbally announced to the officers seconds prior to her arrest, "I'm just recording." (Pl.'s Ex. 8, Video (Doc. 43-8) at 01:09-01:12.) Moreover, she has put forward evidence that Defendant J.R. Smith tried to "snatch" and "break" her phone after they arrested her. (See Pl.'s Ex. 4, Felisha Wall Dep. (Doc. 43-4) at 62; Pl.'s Ex. 1, Shamica Wall Decl. (Doc. 43-1) ¶ 17.) At this stage, unlike Huang, there is more than "a scintilla of evidence" that the Defendant J.R. Smith's decision to arrest Plaintiff was "infected with a retaliatory motive traceable" to the exercise of her First Amendment rights. See Huang, 902 F.2d at 1141. As a result, Plaintiff's § 1983 First Amendment retaliation claim advances to trial.

ii. **Claim IV – Fourth Amendment malicious prosecution pursuant to 42 U.S.C. § 1983 (Defendant J.R. Smith in his individual capacity)**

Plaintiff alleges that Defendant J.R. Smith wrongfully arrested her and "swore out the arrest warrant . . . for the crime of disorderly conduct," despite knowing he lacked probable cause for her arrest. (See Compl. (Doc. 2) ¶¶ 208, 212.)

To establish a Fourth Amendment malicious prosecution claim, "a plaintiff must show that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Hupp, 931 F.3d at 324 (internal citations and quotation marks omitted). "To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." Thompson v. Clark, 596 U.S. 36, 39 (2022).

Here, Plaintiff's charges were dismissed, (Pl.'s Ex. 11, Public Records (Doc. 43-11) at 1), thus establishing a "favorable termination" for Plaintiff. See Thompson, 596 U.S. at 39. Defendants' only argument at summary judgment is that Plaintiff cannot meet the second element of a malicious prosecution claim; that is, they argue her arrest was supported by probable cause. (See Defs.' Br. (Doc. 40) at 18–19.) However,

- 27 -

disputes of fact prevent a finding as to probable cause at this stage. Plaintiff's § 1983 malicious prosecution claim will advance to trial.

### iii. Claim V — Common law malicious prosecution (Defendant J.R. Smith in his individual capacity)

Plaintiff also alleges an identical malicious prosecution claim against Defendant J.R. Smith under state common law. (Compl. (Doc. 2) ¶¶ 215–227.)

To establish malicious prosecution under North Carolina law "a plaintiff must show that the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff." Turner v. Thomas, 369 N.C. 419, 425, 794 S.E.2d 439, 444 (2016).

Under North Carolina law, the dismissal of an action is ordinarily sufficient to show the "proceeding terminated in favor of the plaintiff." See Chidnese v. Chidnese, 210 N.C. App. 299, 305, 708 S.E.2d 725, 731 (2011) (noting that termination in favor of the plaintiff was not an element at issue when "the criminal proceeding was dismissed" by the district attorney); see also Moore v. Evans, 124 N.C. App. 35, 42–43, 476 S.E.2d 415, 421–22 (1996). However, unlike malicious prosecution under federal law, the North Carolina Supreme Court has added that

- 28 -

"where the criminal action is withdrawn or terminated by compromise brought about by the defendant, an action for malicious prosecution based thereon will not lie." Alexander v. Lindsey, 230 N.C. 663, 671, 55 S.E.2d 470, 476 (1949). This court is aware of no precedent overturning or seriously questioning this holding of Alexander, nor have the parties identified one.

Defendants argue that Plaintiff "cannot demonstrate that there was a favorable termination," (Defs.' Br. (Doc. 40) at 24), because Plaintiff's "resisting a public officer" charge was dismissed by the district attorney in exchange for Plaintiff performing community service, (see Defs.' Ex. 3, Elkins Decl. (Doc. 40-28) at 2), which, under Alexander, is a dismissal due to "a compromise brought about by the defendant," see Alexander, 230 N.C. at 671, 55 S.E.2d at 476.

Plaintiff concedes that her "resisting a public officer" charge was dismissed due a comprise but argues that her disorderly conduct charge survives because (1) it was "dismissed favorably" and because (2) "the elements of that charge are distinct and arise from different conduct than the [resist] charge." (See Pl.'s Resp. (Doc. 43) at 19-20.) Defendants reply that because "there was one Magistrate's Order charging Plaintiff with both crimes," Plaintiff cannot separate the two

- 29 -

offenses for the purposes of advancing a malicious prosecution claim. (Defs.' Reply (Doc. 44) at 9-10.)

This court agrees with Plaintiff that her "disorderly conduct" charge appears to have been dismissed for different reasons than her "resisting a public officer" charge. (See Pl.'s Ex. 11, Public Records (Doc. 43-11) at 1 (resisting offense "dismiss[ed] without leave by DA" while disorderly conduct offense "dismissed by court"); Defs.' Ex. 3, Elkins Decl. (Doc. 40-28) at 2 (emphasizing that Plaintiff's performance of community service was specific to the dismissal of her resisting charge); Doc. 9-2 at 2, 6 (resisting offense dismissed for "Other: Complied" while disorderly conduct offense dismissed "by the court" because "court finds warrant is fatally defective on this charge").) Further, because there is no evidence of a compromise, the grounds for dismissal of Plaintiff's disorderly conduct charge appears to qualify as a favorable termination. See Turner, 369 N.C. at 425, 794 S.E.2d at 444.

Defendants cite no authority which supports their argument that this court must treat multiple charges brought under one warrant, dismissed on entirely distinct grounds, as one for the purposes of a malicious prosecution claim. (See Defs.' Br. (Doc. 40) at 25; Defs.' Reply (Doc. 44) at 9-10.) On the contrary, Plaintiff cites to a malicious prosecution case out of the

- 30 -

Western District of North Carolina that deals with this issue, albeit collaterally. (See Pl.'s Resp. (Doc. 43) at 20 (citing Cloaninger v. McDevitt, No. 106-cv-135, 2006 WL 2570586 (W.D.N.C. Sept. 3, 2006)).)[11]

While there appears to be an absence of binding authority in North Carolina on this issue, the Second Circuit has reasoned persuasively that when multiple charges are brought against one defendant and are resolved by distinct dispositions — some that qualify as "favorable termination" and some that do not — the defendant may proceed with a malicious prosecution claim regarding the charges that do qualify. See Janetka v. Dabe, 892 F.2d 187, 190. Otherwise, the Second Circuit reasons, "police officers could add unsupported . . . charges to legitimate . . . charges with impunity." Id.

Here, where Plaintiff based her common law malicious prosecution claim against Defendant J.R. Smith entirely on his arrest "for the crime of disorderly conduct," (Compl. (Doc. 2) ¶ 218), where Plaintiff's alleged conduct underlying the disorderly conduct charge is different from the conduct

---

[11] In their reply brief, Defendants note, and this court agrees, that there is a factual distinction between Cloaninger and Plaintiff's claim in that the charges in Cloaninger were "procured as separate warrants," Cloaninger, 2006 WL 2570586 at *9, and a legal distinction in that the central issue in Cloaninger was res judicata and not "favorable termination," see id. (See Defs.' Reply (Doc. 44) at 9.)

underlying the resisting charge, and where Plaintiff's disorderly conduct charge was terminated favorably, this court finds the Second Circuit's reasoning persuasive and rules that Plaintiff's common law malicious prosecution claim as to her disorderly conduct charge may proceed to trial.

## V.  CONCLUSION

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion for Partial Summary Judgment, (Doc. 39), is **GRANTED IN PART** and **DENIED IN PART**.

It is **GRANTED** as to Claim V, Claim VI, and Claim IX insofar as these claims are brought against Defendants in their official capacity. Claims V, VI, and IX are **DISMISSED** against Defendants in their official capacities only.

It is **DENIED** as to Claim II and Claim IV. It is further **DENIED** as to Claim V and Claim IX insofar as these claims are brought against Defendant in his individual capacity.

This the 31st day of March, 2025.

_____
United States District Judge

- 32 -